**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------- X
HDTRACKS.COM, LLC,                :
                                  :
                  Plaintiff,      :
                                  :
     -against-                    :
                                  :
7DIGITAL GROUP PLC, and           :
7DIGITAL LIMITED, a UK private    :
limited company,                  :
                                  :
                  Defendants.     :
-------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/19/2019

No. 18 Civ. 5823 (JFK)
**OPINION & ORDER**

APPEARANCES

FOR PLAINTIFF HDTRACKS.COM, LLC
    Richard S. Busch
    KING & BALLOW

FOR DEFENDANTS 7DIGITAL GROUP PLC and 7DIGITAL LIMITED
    William L. Charron
    Matthew S. Barkan
    PRYOR CASHMAN LLP

**JOHN F. KEENAN, United States District Judge:**

Plaintiff HDtracks.com, LLC ("HDT"), a New York online music store, brings suit against 7digital Group PLC ("7d Group") and its subsidiary, 7digital Limited ("7d Limited"), United Kingdom music label service providers (collectively, "Defendants"), for breach of contract, fraudulent inducement, and unjust enrichment. HDT alleges that Defendants falsely promised to build a first-of-its-kind music streaming platform and, by failing to do so, Defendants caused HDT to lose its dominant market position, suffer reputational harm, and lose millions of dollars in future profits. Jurisdiction is based on

1

diversity of citizenship pursuant to 28 U.S.C. § 1332(a).

Before the Court is Defendants' motion to dismiss the Second

Amended Complaint ("the SAC") pursuant to Rule 12(b)(2) or, in

the alternative, 12(b)(6) of the Federal Rules of Civil

Procedure.  For the reasons set forth below, Defendants' motion

is GRANTED in part and DENIED in part.

### I.  Background

Unless stated below, the Court takes the following facts

and allegations from the SAC and, for the purpose of this

motion, deems them to be true.

HDT is a New York-based high-resolution music download

store and a well-respected member of the audiophile community

and consumer electronics industry.  (SAC ¶ 17.)  7d Limited is a

private UK company and a subsidiary of 7d Group, a public UK

company that owns and controls at least 75 percent of 7d

Limited.  (Id. ¶¶ 10-12.)  Defendants are based in London, where

they share the same address, website, and logo, and many of the

same directors and officers.  (Id.)  Defendants offer technical

infrastructure and global music rights licensing and hosting

services to help customers create music streaming and radio

services.  (Id. ¶ 23.)

Since at least 2012, HDT sought to capitalize on its

success in the music industry and strong user base by being the

first to market a high-resolution music streaming service ("the

streaming service"). (Id. ¶¶ 19-22.) In 2014, Defendants contacted HDT with an offer to build and support the technical platform for the streaming service ("the Platform"). (Id. ¶ 24.) Defendants assured HDT that it would be the first to offer the streaming service and, as the first to market, it would enjoy a competitive advantage and substantial profits as a result. (Id. ¶ 25.) Defendants also made numerous assurances and representations to HDT regarding Defendants' ability to build, deliver, and support the streaming service. (Id. ¶¶ 3, 24.) Many of these representations, however, were false because Defendants had no history of building or running a high-resolution streaming service. (Id. ¶ 36.)

In January 2016, Defendants suggested that HDT engage a 7d Group board member to provide a valuation of the streaming service prior to entering into a formal agreement with Defendants. (Id. ¶ 27.) HDT agreed and, in February 2016, it payed approximately $45,000 to the board member for his consulting and advisory services. (Id. ¶ 28.) The board member projected that the streaming service would be highly successful and profitable and that a conservative valuation showed profits in the millions of dollars during the first five years of business. (Id. ¶¶ 29-30.) This solidified HDT's trust and reliance on Defendants. (Id. ¶ 31.)

In June 2016, after two years of negotiations, HDT and Defendants signed a term sheet to memorialize their agreement ("the Term Sheet"). (Id. ¶ 38.) Defendants were aware of the importance of launching the Platform no later than January 2017. (Id. ¶ 32.) Further, HDT was induced to enter into the agreement because Defendants falsely represented that they had invested millions of dollars into a music streaming platform and they were equipped with the manpower and expertise to quickly complete the project. (Id. ¶¶ 34-36.)

### A. The Term Sheet[1]

The Term Sheet was between 7d Limited and HDT. (Ex. A to Decl. of William L. Charron in Supp. of Mot. to Dismiss (Nov. 5, 2018), ECF No. 35-1 ("Term Sheet") at 1.) The top of the first page stated: "This Term Sheet does not constitute an offer, is non-binding and is solely for discussion purposes. No agreement or obligation will arise for either party, except as set forth in a definitive written agreement executed by the parties." (Id.) A little further down the page, the Term Sheet stated:

---

[1] Copies of the Term Sheet and draft "long-form" agreements were not attached to the SAC. Defendants, however, provided the documents with their motion to dismiss which the Court recognizes because the agreements are incorporated in the SAC by reference and they are integral to the SAC. See Subaru Distributors Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005) ("In determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint.").

"Company [HDT] and 7digital [7d Limited] . . . wish to enter into this term sheet . . . to govern the provision of the Services by 7digital to Company, with a view to both Parties entering into a long-form agreement." (Id.)

The Term Sheet included a "Schedule 1" that provided the "Scope of Work." (Id. at 4.) The Schedule 1 stated: "The Work Breakdown Structure, High Level Scope of Work and Timeline contained in this Schedule and which form part of the Services (as defined in the Term Sheet above) are for illustrative purposes **ONLY**. The Parties acknowledge and agree that the Breakdown Structure, High Level Scope of Work and Timeline may be subject to change from time to time as this project evolves." (Id. (emphasis in original).)

In exchange for 7d Limited building and supporting the Platform, HDT agreed to pay a "Set-Up Fee" of $100,000 on the effective date of the agreement, $100,000 upon completion of the build work, and $50,000 upon launch of the music service. (Id. at 2-3.) The Term Sheet stipulated that ownership of intellectual property belonged to 7d Limited, "except as to grant a non-exclusive, revocable access license" to HDT. (Id. at 2.) The Term Sheet included a "Schedule 2" with "Post-Launch Terms" that stated: "Subject to the negotiation, agreement and execution of any Long-Form, the Parties intend for" HDT to pay a

monthly license and maintenance fee of $10,000 and certain other subscriber and bandwidth fees. (Id. at 3, 11-12.)

The SAC alleges that the Term Sheet created an enforceable contractual relationship between HDT and Defendants because after it was signed the parties' course of dealing affirmed their obligations and expectations, which were reiterated in numerous in-person meetings, phone calls, and email exchanges. (SAC ¶¶ 42-43.)

As provided by the Term Sheet and requested by 7d Group, on or around July 26, 2016, HDT paid the initial $100,000 "Set-Up Fee" to 7d Limited. (Id. ¶ 45.) In October 2016, the 7d Group board member that HDT had engaged as a consultant provided an updated valuation that showed HDT could anticipate profits of over $30 million during the first five-year period. (Id. ¶ 46.) In December 2016, however, a 7d Group executive advised HDT that it was low on cash and demanded the second installment payment of $100,000. (Id. ¶ 48.) Relying on the executive's representations regarding the progress of the project and its anticipated launch in early 2017, HDT paid another $100,000 to 7d Limited. (Id. ¶ 49.) The SAC alleges that Defendants' statements were knowingly false and were made to induce the second payment. (Id. ¶ 48.)

Defendants continuously assured HDT that the Platform was forthcoming, but, because Defendants had no history of building

such a streaming service, nor the ability or expertise to complete the project as promised, Defendants nevertheless failed to deliver. (Id. ¶¶ 50-57.) As a result, HDT lost its competitive advantage and missed the opportunity to be the first to launch the streaming service at popular technology tradeshows in January and March 2017. (Id.)

## B. The Draft Long-Form Agreements[2]

In March 2017, Defendants sent HDT a proposed long-form agreement that included substantially different terms than those of the Term Sheet. (Id. ¶ 57.) HDT was "shocked" by the contents of the long-form agreement and its removal of certain essential services that the Term Sheet had promised Defendants would build. (Id.) HDT told Defendants that the proposed long-form agreement was not the agreement the parties had reached, Defendants agreed, and the parties continued to operate under the terms of the Term Sheet. (Id.)

---

[2] HDT argues that it would be improper for the Court to consider the draft long-form agreements because HDT did not rely on the terms of the agreements when drafting the SAC and the agreements may be excluded under the parol evidence rule. (Opp. at 16-17, 22 (ECF No. 36).) "[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)). The SAC includes specific allegations regarding the terms of the March 2017 and September 2017 draft long-form agreements in no less than three separate paragraphs. (SAC ¶¶ 57, 64, 65.) Accordingly, HDT's assertion that it did not rely on the terms of the agreements to draft the SAC is without merit.

In May 2017, Defendants proposed issuing a press release to highlight a July 2017 launch of the streaming service. (Id. ¶ 58.) HDT was reluctant to make a public announcement but Defendants persisted and said the press release was needed for Defendants' business growth, stability, and desire for investors. (Id. ¶¶ 59-60.) The press release was ultimately issued, bringing positive attention to Defendants but embarrassment to HDT when the streaming service was not released on time. (Id. ¶ 61.)

Throughout the Summer of 2017, HDT and Defendants continued to negotiate the terms of the long-form agreement, and the parties had daily and weekly conversations regarding the building and testing of the Platform. (Id. ¶¶ 63-64.) In September 2017, Defendants sent a revised draft long-form agreement that was closer to the original terms of the Term Sheet. (Id. ¶ 65.) The September 2017 draft long-form agreement included the following terms, which were unchanged from the March 2017 draft:

> [N]either Party shall be liable to the other Party under or in connection with this Agreement, or any collateral contract, whether arising under statute or out of breach of contract, tort (including negligence), breach of statutory duty, or otherwise, for: (a) any loss of profits, business, goodwill, anticipated savings, revenue, reputation or loss of, damage to, or corruption of data; or (b) any special, indirect or consequential losses.

(Ex. B to Decl. of William L. Charron in Supp. of Mot. to
Dismiss (Nov. 5, 2018), ECF No. 35-2 ("March LFA") at 10; Ex. C
to Decl. of William L. Charron in Supp. of Mot. to Dismiss (Nov.
5, 2018), ECF No. 35-3 ("September LFA") at 10.) And, "[t]his
Agreement and any dispute or claim arising out of or in
connection with it or its subject matter or formation (including
non-contractual disputes or claims) shall be governed by and
construed in accordance with the law of England and Wales."
(March LFA at 15; September LFA at 14.)

In September 2017, HDT learned that Defendants had only
assigned one programmer to work on the Platform, which was in
stark contrast to representations Defendants had made about
their manpower and commitment to building the Platform. (SAC ¶
65.) Nevertheless, HDT continued to allow Defendants to work on
the Platform and, in October 2017, Defendants assured HDT that
it could launch the streaming service the following month. (Id.
¶¶ 66-67.) Once again, Defendants failed to deliver. (Id.)

By April 2018, it was abundantly clear to HDT that
Defendants could not deliver the Platform as promised. (Id. ¶¶
69-70.) That month, HDT notified Defendants that they would not
continue the business relationship. (Id. ¶ 70.) Defendants
expressed remorse and requested an in-person meeting with HDT to
apologize and resolve outstanding issues. (Id. ¶¶ 71-73.)
During the parties' meeting at HDT's New York offices on May 14,

2018, HDT requested compensation for its losses.  (<u>Id.</u> ¶ 73.)
Defendants agreed to respond with an offer, but no such offer
was ever made.  (<u>Id.</u>)  Defendants have not returned the $200,000
that HDT paid based on Defendants' promise to build and deliver
a launch-ready music streaming service.  (<u>Id.</u>)

On June 27, 2018, HDT filed its original complaint, which
was only against 7d Group.  (ECF No. 1.)  On August 9, 2018, HDT
filed a first amended complaint that added 7d Limited as a
defendant.  (ECF No. 19.)  On September 10, 2018, HDT filed the
SAC to address issues relating to subject matter jurisdiction.
(ECF No. 26.)  The SAC alleges five counts against Defendants:
(1) breach of contract; (2) breach of implied contract; (3)
fraudulent inducement; (4) declaratory judgment; and (5) unjust
enrichment.  HDT seeks consequential damages in the form of
millions of dollars of lost future profits, compensatory damages
(including the $200,000 HDT paid to Defendants), and punitive
damages.  On November 5, 2018, Defendants moved to dismiss
pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(6),
and 9(b).  (ECF No. 33.)

## II.  Personal Jurisdiction

"When the Court is confronted by a motion raising a
combination of Rule 12(b) defenses, it will pass on the
jurisdictional issues before considering whether the Complaint
states a claim." <u>Minnie Rose LLC v. Yu</u>, 169 F. Supp. 3d 504, 512

(S.D.N.Y. 2016).  Accordingly, the Court first addresses Defendants' Rule 12(b)(2) lack of personal jurisdiction defense.

### A.  Legal Standard

On a Rule 12(b)(2) motion to dismiss, "plaintiff bears the burden of showing that the court has jurisdiction over the defendant." Siegel v. Ford, No. 16-cv-8077 (JPO), 2017 WL 4119654, at *3 (S.D.N.Y. Sept. 15, 2017) (quotation marks omitted).  Prior to discovery, a plaintiff may defeat a Rule 12(b)(2) motion to dismiss by "a prima facie showing of jurisdiction." Id.  "This showing may be made through the plaintiff's own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." S.N. Eng. Telephone Co. v. Global NAPs, Inc., 624 F.3d 123, 138 (2d Cir. 2010) (internal quotation marks omitted).  "In determining whether a plaintiff has met this burden, we will not draw argumentative inferences in the plaintiff's favor, nor must we accept as true a legal conclusion couched as a factual allegation." In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 659, 673 (2d Cir. 2013) (citation and internal quotation marks omitted).

In diversity cases, "personal jurisdiction is determined in accordance with the law of the forum in which the federal court sits." Minnie Rose, 169 F. Supp. 3d at 512.  New York courts apply a two-step analysis:  First, the Court must "determine

11

whether personal jurisdiction is appropriate pursuant to the
State's general jurisdiction statute, Civil Practice Law and
Rules ("C.P.L.R.") § 301, or its long-arm jurisdiction statute,
C.P.L.R. § 302(a)." Id.  "If and only if the Court's exercise of
personal jurisdiction is deemed appropriate according to New
York law, the second step is an evaluation of whether the
Court's exercise of personal jurisdiction comports with the
Fifth Amendment Due Process Clause of the United States
Constitution." Id.

### B.  New York's Long-Arm Statute

"To establish personal jurisdiction under section
302(a)(1), two requirements must be met: (1) The defendant must
have transacted business within the state; and (2) the claim
asserted must arise from that business activity." Eades v.
Kennedy, PC Law Offices, 799 F.3d 161, 168 (2d Cir. 2015)
(quotation marks omitted).  "A defendant transacts business
within the meaning of § 302(a)(1) when it purposefully 'avails
itself of the privilege of conducting activities [in New York],
thus invoking the benefits and protections of its laws.'" Minnie
Rose, 169 F. Supp. 3d at 513-14 (quoting Fischbarg v. Doucet,
880 N.E.2d 22, 26 (N.Y. 2007)) (alteration in original).
"Section 302(a)(1) is a 'single act' statute:  '[P]roof of one
transaction in New York is sufficient to invoke jurisdiction,
even though the defendant never enters New York, so long as the

defendant's activities here were purposeful and there is a
substantial relationship between the transaction and the claim
asserted.'" Id. at 514 (quoting Kreutter v. McFadden Oil Corp.,
522 N.E.2d 40, 43 (N.Y. 1988)) (alteration in original). "To
determine whether a party has 'transacted business' in New York,
courts must look at the totality of circumstances concerning the
party's interactions with, and activities within, the state."
Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d
779, 787 (2d Cir. 1999). "Rule 302(a)(1) jurisdiction 'requires
only a minimal quantity of activity, provided that it is of the
right nature and quality.'" Siegel, 2017 WL 4119654 at *4
(quotation marks omitted).

Here, the totality of the circumstances alleged forms a
basis for long-arm jurisdiction under § 302(a)(1). First,
Defendants purposefully solicited and created a long-term and
important business relationship with HDT, a New York resident.
(SAC ¶¶ 3-4, 24, 38, 73.) The business relationship began in
2014 and continued through 2018, and during that time Defendants
entered into a signed agreement with HDT that memorialized
Defendants' intent to provide a service to HDT for its use in
New York. Further, Defendants received payment from HDT in
accordance with that agreement. Second, during this years-long
business relationship, Defendants traveled to HDT's New York
office on numerous occasions and routinely communicated with HDT

13

in New York via telephone and email. (Id ¶ 24, 38, 57-61, 65,
71-73; Decl. of David Chesky in Supp. of Pl.'s Opp. to Defs.'
Mot. to Dismiss (Nov. 5, 2018), ECF No. 36-1 ¶¶ 5-24.) Finally,
the scope of Defendants' business relationship with HDT was
substantial: Defendants received $200,000 from HDT to build the
Platform and envisioned a long-term relationship after it was
built that could have earned HDT millions of dollars in revenue.
(SAC ¶¶ 27-30, 45-49.)

Accordingly, personal jurisdiction over Defendants is
proper under New York's long-arm statute. See, e.g., Siegel,
2017 WL 4119654 at *5 (finding personal jurisdiction where a
business relationship continued for at least ten months,
defendant traveled to New York to meet with plaintiff at least
three times, defendant sent a product sample to plaintiff in New
York, the parties frequently talked on the phone, and the scope
of the business relationship was substantial where plaintiff
claimed to have paid $340,000 directly to defendant and an
additional $200,000 in related expenditures); Minnie Rose, 169
F. Supp. 3d at 513-14 (finding a similar purposeful business
relationship was sufficient to establish personal jurisdiction).

### C. Due Process

"To establish personal jurisdiction over a defendant, due
process requires a plaintiff to allege (1) that a defendant has
certain minimum contacts with the relevant forum, and (2) that

the exercise of jurisdiction is reasonable in the circumstances." SPV Osus Ltd. v. UBS AG, 882 F.3d 333, 343 (2d Cir. 2018) (quoting In re Terrorist Attacks, 714 F.3d at 674). "The requisite 'minimum contacts' analysis 'overlaps significantly' with New York's § 302(a)(1) inquiry into whether a defendant transacted business in the State." Minnie Rose, 169 F. Supp. 3d at 515 (quoting Brown v. Web.com Group, Inc., 57 F. Supp. 3d 345, 358 (S.D.N.Y. 2014)).

## 1. Alter Ego Liability

As discussed above, the totality of the circumstances establishes Defendants' sufficient contacts under § 302(a)(1). Defendants, however, argue that HDT has not established constitutionally permitted "substantial" minimum contacts over both 7d Group and 7d Limited where the basis of HDT's claims are centered on 7d Limited's contacts with New York due to its—and not 7d Group's—failed efforts to build the Platform as provided in the Term Sheet.

"Lumping all the 'defendants' together for purposes of alleging connections to New York is . . . patently insufficient." Giuliano v. Barch, No. 16-cv-0859 (NSR), 2017 WL 1234042, at *14 (S.D.N.Y. Mar. 31, 2017). To exercise personal jurisdiction over a defendant, "[a] court must look to 'whether there was some act by which the defendant purposefully availed itself of the privilege of conducting activities within the

forum State[.]'" SPV Osus, 882 F.3d at 344 (quoting Goodyear
Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 924
(2011)).  HDT argues that sufficient contacts exist with respect
to 7d Group, notwithstanding that it was not a party to the Term
Sheet and it did not receive any payments from HDT, because 7d
Group is the alter ego of 7d Limited.  The Court disagrees.

### a.  Applicable Law

Whether 7d Group is the alter ego of 7d Limited such that
personal jurisdiction can be exercised over 7d Group, or that it
can be held jointly and severally liable for wrongdoing by 7d
Limited, requires HDT to "adequately plead that circumstances
exist that warrant 'piercing the corporate veil' of the
Corporations." Sofi Classic S.A. de C.V. v. Hurowitz, 444 F.
Supp. 2d 231, 239-40 (S.D.N.Y. 2006).  "Under New York's choice
of law principles, the law of the jurisdiction having the
greatest interest in the litigation will be applied." Id.
(citing Kalb, Voorhis & Co. v. Am. Fin. Corp., 8 F.3d 130, 132
(2d Cir. 1993)).  Here, England has the greatest interest in
whether one of its corporations is subject to personal
jurisdiction in a United States district court.  Accordingly,
the Court applies English law to its analysis of whether 7d
Group is the alter ego of 7d Limited.  See Kalb, 8 F.3d at 132
("The law of the state of incorporation determines when the
corporate form will be disregarded and liability will be imposed

on shareholders[.]") (citing Restatement (Second) of Conflict of Laws § 307 (Am. Law Inst. 1971)).

### b. Analysis

HDT does not dispute that English law permits corporate veil-piercing only under exceptional circumstances where a company's separate legal personality is being abused for the purpose of some relevant wrongdoing.  In FR 8 Singapore Pte. Ltd. v. Albacore Maritime Inc., 794 F. Supp. 2d 449 (S.D.N.Y. 2011), the court examined Judge Cote's analysis of English law on this subject in In re Tyson, 433 B.R. 68 (S.D.N.Y. 2010).  FR 8 Singapore explained that "veil piercing is quite rare under English law" and "the fact that a person engages in the carrying on of a business using a duly incorporated, yet seemingly artificial, entity is not sufficient to justify piercing that entity's veil." 794 F. Supp. 2d at 459-60 (quoting Tyson, 433 B.R. at 86).  "Second, courts may pierce the corporate veil only where special circumstances exist indicating that it is a mere façade concealing the true facts." Id. at 460 (quoting Tyson, 433 B.R. at 87).  Finally, "where a corporate structure is interposed for the purpose of shielding a defendant from liability . . ., the plaintiff's ability to recover from the defendant on a veil-piercing theory turns on whether the defendant had already incurred some liability to the plaintiff

at the time he interposed the corporate structure." Id. (quoting Tyson, 433 B.R. at 88).

Applying English law to the SAC in this case, HDT does not plausibly allege circumstances in which an English court would pierce the corporate veil. The SAC merely alleges that 7d Group and 7d Limited share the same address, website, logo, and directors and officers, and that 7d Group owns and controls a significant portion of 7d Limited. The SAC does not contain any allegations that 7d Group abuses 7d Limited for the purpose of wrongdoing, or "that impropriety was linked to the corporate structure." Id. Accordingly, the Court will not pierce the corporate veil and, instead, it will consider whether personal jurisdiction exists for 7d Group and 7d Limited, on an individual basis.

## 2. Sufficient Minimum Contacts

The SAC alleges that top-level officials of both 7d Group and 7d Limited sought out HDT in its only place of business, New York, and both entities promised to build and deliver a $250,000 product for HDT's use in New York. Further, Defendants do not contest that 7d Limited signed the Term Sheet and, as discussed below, 7d Limited now admits that an implied and legally enforceable contract arose between itself and HDT related to performance of the Term Sheet. The SAC also alleges that all

payments HDT provided were requested by 7d Group and paid to 7d
Limited.

"The defendant's suit-related conduct must create a
substantial connection with the forum State. A defendant's
general connections with the forum are not enough to support the
exercise of specific jurisdiction." SPV Osus, 882 F.3d at 344
(citation, alterations, and internal quotation marks omitted).
Here, 7d Limited's connections to New York and HDT's claims are
sufficient minimum contacts for the same reasons as those that
form the basis of the Court's long-arm jurisdiction under §
302(a)(1).

7d Group's connections, by contrast, are too tenuous to
support the exercise of specific personal jurisdiction. HDT
contends that 7d Group operated in concert with 7d Limited, as
reflected by the SAC's allegation that 7d Group always requested
the payments, which HDT then paid to 7d Limited. The Court is
not persuaded. The SAC does not plausibly allege that 7d Group
was a party to the business relationship between HDT and 7d
Limited that gives rise to 7d Limited's sufficient minimum
contacts, especially where, as here, the relevant document that
served to implicitly bind the parties was expressly between HDT
and 7d Limited. Drawing all reasonable inferences in favor of
HDT, the overwhelming inference is that the contacts relating to
the litigation were performed solely by 7d Limited, HDT's only

counterparty to the Term Sheet.  "At bottom, the contacts alleged by [HDT] between [7d Group], the forum and the litigation amount to a handful of communications and transfers of funds." Id. at 345.  This is not enough. Id.  Accordingly, 7d Group is dismissed for lack of personal jurisdiction.

### 3.  Reasonableness

"Part two of the due process inquiry—the reasonableness of a Court's assertion of personal jurisdiction—depends on a consideration of '(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the most efficient resolution of the controversy; and (5) the interests of the state in furthering substantive social policies.'" Siegel, 2017 WL 4119654 at *5 (quoting Minnie Rose, 169 F. Supp. 3d at 515).  "Where a plaintiff makes the threshold showing of the minimum contacts . . . a defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Bank Brussels, 305 F.3d at 129 (internal quotation marks omitted).

Defendants do not present a compelling argument that personal jurisdiction over 7d Limited is unreasonable.  First, as discussed below, 7d Limited has accepted the existence of an implied contract with HDT.  Second, "New York has a strong

interest in adjudicating cases of alleged fraud perpetrated against New York corporations." <u>Minnie Rose</u>, 169 F. Supp. 3d at 516.  Finally, 7d Limited has essentially agreed to resolve the parties' dispute in this Court by asserting that it "looks forward to proving at summary judgment that [HDT's] implied in fact contract claim is meritless."  (Reply at 1 (ECF No. 37).) Accordingly, specific personal jurisdiction over 7d Limited comports with due process.

## III.  Failure to State a Claim

### A.  Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556). On a motion to dismiss, the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 152 (2d Cir. 2002).  "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's

statement of a claim for relief without resolving a contest regarding its substantive merits.'" <u>Halebian v. Berv</u>, 644 F.3d 122, 130 (2d Cir. 2011) (quoting <u>Glob. Network Commc'ns, Inc. v. N.Y.C.</u>, 458 F.3d 150, 155 (2d Cir. 2006)).

In addition to the requirements of Rule 12(b)(6), a complaint alleging fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) by stating the circumstances constituting fraud "with particularity." <u>ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.</u>, 553 F.3d 187, 196 (2d Cir. 2009). The adequacy of particularized allegations under Rule 9(b) is "case- and context-specific." <u>Espinoza ex rel. JPMorgan Chase & Co. v. Dimon</u>, 797 F.3d 229, 236 (2d Cir. 2015).

### B. Duplicative Claims

Defendants accept the existence of an implied contract between 7d Limited and HDT regarding 7d Limited's efforts to build and launch the Platform.[3] Accordingly, the SAC's breach of implied contract claim survives. The terms of the implied contract and the obligations the parties incurred under it are

---

[3] The SAC alleges that an implied contract existed based on (1) the time spent negotiating the terms of the long-form agreement; (2) the Term Sheet's detail regarding the scope of work to be performed and the obligations of the parties; (3) the parties' actions under the Term Sheet, including Defendants' demanding payment to perform, and HDT providing payments; (4) Defendants' acceptance of the two $100,000 payments; and (5) Defendants' assurance that it was working to build and deliver the streaming service. (SAC ¶ 3.)

disputed questions of fact, which the Court cannot resolve at this time.

Defendants argue that, because they have acknowledged an implied contract existed, HDT's claims for breach of express contract, unjust enrichment, and damages for fraudulent inducement must be dismissed because they rely on the same facts as HDT's breach of implied contract claim. Each additional claim is discussed in turn below.

### 1. Breach of Contract

To state a cause of action for breach of contract under New York law, a plaintiff must allege: "(1) the existence of a contract between itself and th[e] defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by th[e] defendant; and (4) damages to the plaintiff caused by th[e] defendant's breach." Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011).

By its plain terms, the Term Sheet was a "non-binding" agreement that contemplated the preparation and execution of a future "definitive written agreement" between HDT and 7d Limited. (Term Sheet at 1.) The Term Sheet therefore belongs to a class of agreements known as "preliminary agreements" that, in some circumstances, "can create binding obligations." Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543,

548 (2d Cir. 1998). For the Term Sheet to have been a binding contract between HDT and 7d Limited depends on whether the parties were "fully bound to carry out the terms of the agreement even if the formal instrument is never executed," or whether "the parties are bound only to make a good faith effort to negotiate and agree upon the open terms and a final agreement." Id. "The key, of course, is the intent of the parties: whether the parties intended to be bound, and if so, to what extent." Id. at 548-49.

Courts consider four factors when determining whether a preliminary agreement is enforceable as to the "ultimate contractual objective":

> (1) whether there is an expressed reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

Brown v. Cara, 420 F.3d 148, 154 (2d Cir. 2005) (quoting Adjustrite, 145 F.3d at 549).

HDT claims that the Term Sheet created a fully binding agreement that 7d Limited then breached by failing to deliver a high-resolution music streaming service to HDT. (SAC ¶ 104.) Drawing all reasonable inferences in HDT's favor, however, the clear language of the Term Sheet and the parties' actions after signing it, do not evidence an intent by 7d Limited to be bound

24

to such a contract.  First, the Term Sheet expressly said it was non-binding.  Cf. Brown, 420 F.3d at 154 (stating the first factor "is frequently the most important").  Second, HDT and Defendants continued to negotiate the terms of the formal, long-form agreement for more than a year after the Term Sheet was executed, and the parties ultimately never agreed on all the points that required negotiation.  (SAC ¶¶ 57, 64-65.)  Finally, although HDT and 7d Limited partially performed under the Term Sheet, this fact is not dispositive, especially where the other factors demonstrate that the parties did not agree on all material elements of the transaction, intend to be fully bound when they signed the agreement, nor consider the formal agreement to be an unnecessary formality. See Adjustrite, 145 F.3d at 551; see also Brown, 420 F.3d at 156.  Partial performance by a party signals the existence of an implied contract, but this fact alone does not establish an express contract.

Accordingly, the Term Sheet was not a fully binding agreement that obligated 7d Limited to deliver the streaming service to HDT, and thus, HDT's breach of contract claim must be dismissed.

## 2.  Unjust Enrichment

To state a cause of action for unjust enrichment, a plaintiff must allege: "(1) that the defendant was enriched; (2)

that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." Golden Pac. Bancorp v. F.D.I.C., 273 F.3d 509, 519 (2d Cir. 2001). Although 7d Limited has accepted the existence of an implied contract, it has not stipulated to it, nor to the obligations that arose under such a contract. "While a party generally may not simultaneously recover upon a breach of contract and unjust enrichment claim arising from the same facts, it is still permissible to plead such claims as alternative theories." Singer v. Xipto Inc., 852 F. Supp. 2d 416, 426 (S.D.N.Y. 2012) (citing Fantozzi v. Axsys Techs., Inc., No. 07-cv-2667 (LMM), 2008 WL 4866054, at *3 (S.D.N.Y. Nov. 6, 2008)). Accordingly, at this stage, the SAC's unjust enrichment claim is permitted under Federal Rule of Civil Procedure 8(d)(3) as an alternative pleading.

### 3. Fraudulent Inducement

"To state a claim for fraud in the inducement, [plaintiff] must allege: (i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by [plaintiff]; and (iv) resulting damages." Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 143 (2d Cir. 2011). Such claims are subject to Rule 9(b) which "requires that a plaintiff set forth the who, what,

when, where and how of the alleged fraud." <u>Minnie Rose</u>, 169 F.

Supp. 3d at 511.  "[T]he point of Rule 9(b) is to ensure that

there is sufficient substance to the allegations to both afford

the defendant the opportunity to prepare a response and to

warrant further judicial process." <u>United States ex rel.</u>

<u>Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.</u>,

865 F.3d 71, 87 (2d Cir. 2017) (quoting <u>United States ex rel.</u>

<u>Heath v. AT&T, Inc.</u>, 791 F.3d 112, 125 (D.C. Cir. 2015)).

HDT identifies five alleged misrepresentations by

Defendants that fraudulently induced the parties' business

relationship:

1. In 2014, Pete Downton promoted Defendants to HDT by touting how HDT could be first in the market to offer a high-resolution music streaming service.  (SAC ¶ 24.)

2. Simon Cole assured HDT that everyone was fully committed to the project.  (<u>Id.</u> ¶ 29.)

3. Unnamed individuals told HDT that Defendants had invested millions of dollars into developing a platform for a high-resolution music streaming service and Defendants had the manpower and expertise to provide the Platform to HDT. (<u>Id.</u> ¶¶ 3, 24, 33-34, 65.)

4. Unnamed individuals assured HDT that it would enjoy a competitive advantage and substantial profits.  (<u>Id.</u> ¶ 25.)

5. Eric Cohen projected that HDT's profits would grow by millions of dollars during the first five years.  (<u>Id.</u> ¶ 30.)

HDT's fraudulent inducement claim must be dismissed for

failure to state a claim with particularity.  First,

misrepresentations #1, #4, and #5 are forward-looking

predictions, not material misrepresentations of a presently existing or past fact. Such allegedly false statements are not actionable under a fraudulent inducement claim. See New York Univ. v. Factory Mut. Ins. Co., No. 15-cv-8505 (NRB), 2018 WL 1737745, at *8 (S.D.N.Y. Mar. 27, 2018) ("[F]raudulent inducement requires 'a material misrepresentation of a presently existing or past fact[.]' . . . Such a representation is either true or false at the time it is made and cannot become false (i.e., the prediction fails to come to pass) with the passage of time.").

Second, the SAC's alleged misrepresentations fail to meet the requirements of Rule 9(b). To satisfy Rule 9(b) a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Chorches, 865 F.3d at 81 (quotation marks omitted). Here, misrepresentations #3 and #4 fail to identify the speaker. See Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am., et al., No. 18-cv-8152 (JFK), 2019 WL 5595042, at *14 (S.D.N.Y. Oct. 30, 2019) (finding Rule 9(b) was not met where the complaint did not identify the individual speaker or where the misrepresentations were made). Further, HDT fails to sufficiently identify the "where" and "when" for any of the alleged misrepresentations. See id.

Finally, misrepresentation #2 fails to allege that Cole acted with scienter. "Rule 9(b)'s heightened particularity requirement does not apply to allegations regarding fraudulent intent, also known as scienter, which may be alleged generally." Minnie Rose, 169 F. Supp. 3d at 511. Plaintiffs, however, "are still required to plead the factual basis which gives rise to a 'strong inference' of fraudulent intent." Stephenson v. PricewaterhouseCoopers, LLP, 482 Fed. App'x 618, 622 (2d Cir. 2012) (emphasis in original). "An inference is 'strong' if it is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" Loreley Financing (Jersey) No. 3. Ltd. v. Wells Fargo Securities, LLC, 797 F.3d 160, 176-77 (2d Cir. 2015) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007)). Here, the SAC does not identify when Cole made the allegedly false statement and, thus, it is impossible to infer whether, at the time Cole made the statement, Defendants were or were not fully committed to the project. Further, the SAC does not offer a factual basis for any inference, much less a strong one, that Cole acted with the requisite intent to defraud HDT. Accordingly, the SAC's fraudulent inducement claim must be dismissed.

### C. Consequential Damages

"In New York, a party is entitled to recover [consequential damages in the] form of lost profits only if (1) it is

demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties." Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 109 (2d Cir. 2007). "Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements." Id.

7d Limited argues that HDT's consequential damages prayer for relief must be dismissed because the SAC does not plausibly allege a basis for finding it liable for millions of dollars in lost profits. HDT argues that, absent clear contractual language to the contrary, whether consequential damages are available is a question of fact inappropriate for resolution at this procedural stage.

Drawing all reasonable inferences in favor of HDT, the Court declines to dismiss the SAC's request for consequential damages at this time. First, as 7d Limited has accepted, an implied contract existed between the parties relating to 7d Limited's efforts to build the Platform. Neither the parties' conduct that gave rise to the implied contract, the signed Term Sheet, nor other elements of the business relationship alleged by HDT, clearly demonstrate that consequential damages were not contemplated by the implied contract. The Court notes that

similarities between the March 2017 and September 2017 draft long-form agreements may convince a fact-finder that the implied contract did not intend for liability for "(a) any loss of profits . . . or (b) any special, indirect or consequential losses." (March LFA at 10; September LFA at 10.) But, because no agreement was ever reached regarding the long-form agreement, the Court will not draw the inference against HDT that it waived consequential damages under the terms of the implied contract simply because the draft long-form agreements were unchanged in this one section.

Second, although the Term Sheet and the draft long-form agreements envisioned that Defendants would have granted HDT a "non-exclusive, revocable access license" to the Platform after it was built and launched, (Term Sheet at 2), the SAC plausibly alleges a strong business relationship between HDT and Defendants that would have continued indefinitely. Indeed, Defendants' own executives were the ones who forecasted and predicted HDT's future profits. Such facts, presumed to be true at this stage of the litigation, give rise to the inference that Defendants would not have revoked HDT's ability to earn income from the streaming service had they been able to build the Platform.

Finally, the difference between the $200,000 that HDT paid to Defendants and the tens of millions of dollars now sought in

damages is not sufficient reason to dismiss HDT's entire

consequential damages request without first allowing an inquiry

into the terms of the implied contract.  Such grounds for

dismissal, however, may be appropriate after completion of

discovery. See, e.g., Awards.com, LLC v. Kinko's, Inc., 42

A.D.3d 178, 184 (1st Dep't 2007), aff'd, 925 N.E.2d 926 (N.Y.

2010) (stating, on a motion for summary judgment, "[i]t would be

highly speculative and unreasonable to infer an intent to assume

the risk of lost profits in what was to be a start-up venture").

Accordingly, HDT's consequential damages prayer for relief

survives, for now.

### D.  Declaratory Judgment

HDT requests a declaration pursuant to 28 U.S.C. § 2201

that Defendants were obligated to deliver the Platform to HDT

and, because Defendants did not, HDT is owed substantial damages

for its lost future profits.  7d Limited argues that this claim

should be dismissed because it has accepted that an implied

contract existed and HDT is not owed consequential damages.

> The declaratory judgment is a remedy the availability of
> which is committed to the discretion of the district
> court.  It need not be granted unless (1) the judgment
> will serve a useful purpose in clarifying and settling
> the legal relations in issue, or (2) it will terminate
> and afford relief from the uncertainty, insecurity, and
> controversy giving rise to the proceeding.

Bristol-Myers Squibb Co. v. SR Int'l Bus. Ins. Co., 354 F. Supp.

2d 499, 506 (S.D.N.Y. 2005) (citation and internal quotation

marks omitted).  As discussed above, a case or controversy exists regarding the terms of the implied contract and whether HDT is entitled to seek consequential damages.  Accordingly, declaratory judgment may serve a useful purpose and the claim therefore survives.

### IV.  Leave to Amend

Rule 15 of the Federal Rules of Civil Procedure instructs courts to "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2).  Amendment is not warranted, however, "absent some indication as to what [a plaintiff] might add to [its] complaint in order to make it viable." Shemian v. Research In Motion Ltd., 570 F. App'x 32, 37 (2d Cir. 2014) (quoting Horoshko v. Citibank, N.A., 373 F.3d 248, 249 (2d Cir. 2004) (per curiam)).  Accordingly, should HDT wish to amend the SAC, HDT must demonstrate (1) how it will cure the deficiencies in its claims by filing a proposed third amended complaint and (2) that justice requires granting leave to amend.  Such demonstration shall be filed within 30 days of the date of this Opinion.

### V.  Conclusion

For the reasons stated above, Defendants' motion to dismiss the complaint is GRANTED with respect to Defendant 7d Group and Counts I (breach of contract) and III (fraudulent inducement). Defendants' motion is DENIED with respect to Counts II (breach

of implied contract), IV (declaratory judgment), and V (unjust enrichment).

The Clerk of Court is directed to terminate the motion docketed at ECF No. 33 and terminate 7d Group as a defendant.

**SO ORDERED.**

Dated:    New York, New York
          November 19, 2019

_John F. Keenan_
John F. Keenan
United States District Judge